15858

MOSELEY *ET AL.* v. WELCH *ET AL.*

(39 S. E. (2d), 133)

*Mr. F. R. Hemingway,* of Kingstree, and *Messrs. John I. Cosgrove, Huger Sinkler,* and *R. McC. Figg,* all of Charleston, for Appellants,

*Mr. Henry E. Davis,* of Florence, for Rsepondents,

July 19, 1946.

Mr. Associate Justice Oxner delivered the unanimous Opinion of the Court.

Respondents in this action seek to have declared invalid, as being in conflict with various provisions of the State and Federal Constitutions, an act of the General Assembly relating to the operation of the public schools of Williamburg County which was approved on March 20, 1944 (Act No. 502, Acts of 1944; 43 St. at L., page 1368 *et seq.*), and to enjoin appellants from proceeding thereunder. By consent, the cause was referred to A. F. Woods, Esq., as special referee, who, after taking certain testimony, filed a report in which he found that certain provisions of the Act were unconstitutional, but concluded that after these were eliminated, "that which remains is a complete act in itself, capable of being executed independently of the unconstitutional parts without doing undue violence to the legislative intent." Both parties filed exceptions to this report which were heard by Judge Grimball, Resident Judge of the Ninth Circuit, who thereafter filed a decree in which he held that the entire Act was unconstitutional and issued the permanent injunction sought by respondents. The case is now before us on exceptions by appellants to the decree of Judge Grimball.

The evident purpose of the Act mentioned was to adopt in Williamsburg County what is frequently referred to as the "County Unit Plan" of education. Under the terms of the Act, the existing County Board of Education is abolished and its duties devolved upon a new County Board of Education which the Act creates, consisting of seven members to be appointed by the Governor on the recommendation of the legislative delegation from that county (Sections 1 and 12). A clerk for the Board is authorized (Section 4). The

trustees of the several school districts in the County are required each year to submit to the Board a budget for the operation of the schools within their respective districts for the ensuing fiscal year and to meet with the Board for the purpose of adjusting any differences between the budget proposed and that deemed proper by the Board, but the right of final determination as to the amount of the budget for each school district is vested in the Board (Section 7). The County Auditor is directed to levy annually a sufficient county-wide tax, not exceeding fifteen mills, to meet the cost of the current operation of the schools (Section 8). The Board is empowered to fix a salary schedule for all teachers in the several high school districts of the County, which shall be in conformity with their respective qualifications and certifications by the State Board of Education (Section 14). All borrowing of funds for school purposes of the County, whether in anticipation of the collection of taxes, State aid or otherwise, shall be done by the Board on notes of the County (Section 13). The construction of any new buildings, as well as any repairs or additions to those existing, shall be approved by the Board (Section 3). The Board is empowered each year to include in the school budget an amount not exceeding $100,000.00 for constructing, enlarging, repairing or equipping school buildings and is authorized, with the consent of the Senator and at least two members of the House from Williamsburg County, "to borrow any amount over and above the aforesaid $100,000.00 needed" for such purposes, said loans to run for a period not exceeding ten years and to be secured by the full faith, credit and taxing power of the County (Section 5). All outstanding bonded indebtedness of the several school districts is transferred to and assumed by the County Board of Education created under the terms of the Act, and the full faith and credit of the Board is pledged to the payment of said bonded indebtedness; the County Treasurer is directed "to place all monies now in the bond sinking funds of the several school districts into a County School Bond Sinking Fund, to which fund all re-

ceipts from levies for bond purposes shall be placed and from which fund all payments of interest and principal for bond purposes shall be made" (Section 5). The Act directs that there shall be an annual county-wide tax levy, not exceeding five mills, sufficient to pay the interest and principal on all outstanding bonds and "the principal sums and interest on such indebtedness as may thereafter be incurred" under the terms of the Act; it is further provided that said tax "shall be in lieu of all taxes for bond payments as are now levied on the several school districts of Williamsburg County" (Section 6). The County Treasurer is directed "to make an offset between all current operation deficits and balances", existing after July 1, 1944, of the several school districts of the County and to place the difference into one fund to be known as the County Board Fund, which is to be subject to the order of the County Board of Education. The Act further provides that "all school funds collected in the future from special operating levies or from other sources shall be credited to the County Board Fund" (Section 2). All school district levies and all county levies for school bonds and ordinary school purposes other than those provided for in the Act are repealed (Section 10).

A certain portion of Williamsburg County already consolidated with Lake City School District of Florence County is exempted from the provisions of the Act (Section 15). It is further provided that if any sentence or section of the Act is declared unconstitutional, it shall not be construed to invalidate the remainder (Section 16). The Act provides for the organization of the Board created and for the per diem pay and travel allowance of its members (Section 9).

The foregoing synopsis of the terms of the Act includes all of its essential features. Some of these will be hereinafter referred to in more detail.

We approach the consideration of the various constitutional grounds upon which this legislation is challenged with the following well-settled principles in mind: The su-

preme legislative power of the State is vested in the General Assembly; the provisions of our State Constitution are not a grant but a limitation of legislative power, so that the General Assembly may enact any law not expressly, or by clear implication, prohibited by the State or Federal Constitution; a statute will, if possible, be construed so as to render it valid; every presumption will be made in favor of the constitutionality of a legislative enactment; and a statute will be declared unconstitutional only when its invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution. *Santee Mills et al. v. Query et al.,* 122 S. C., 158, 115 S. E., 202; *Clarke v. S. C. Public Service Authority et al.,* 177 S. C., 427, 181 S. E., 481; *Ellerbe v. David, County Treasurer, et al.,* 193 S. C., 332, 8 S. E. (2d), 518; *Pickelsimer v. Pratt et al.,* 198 S. C., 225, 17 S. E. (2d), 524.

■ It is contended that the Act in question violates that portion of Section 34, Article 3, of the Constitution which forbids the enactment of a local or special law (1) to incorporate a school district or (2) in any case where a general law can be made applicable. It is evident that the Act makes no attempt to incorporate a school district. We, therefore, proceed to determine whether it is a special law where a general law can be made applicable. This same section of the Constitution provides that "nothing contained in this section shall prohibit the General Assembly from enacting special provisions in general laws."

■ The general school of law of the State is contained in Chapter 122, Sections 5272 through 5512, of the 1942 Code, as amended. Many of these sections contain special provisions relating to various counties. This chapter is immediately followed by Chapter 122-A, Sections 5513 through 5675, which contains special legislation relating mainly to the fiscal school affairs of each of the forty-six counties of the State. As stated by the Special Referee, "this is at least indicative of a consistent legislative opinion that conditions in the various counties are such as to preclude uniformity of treat-

ment in relation to the administration of school affairs". This conclusion of the General Assembly is entitled to much respect and in doubtful cases should be followed. *Spartanburg County v. Miller, County Treasurer, et al.,* 135 S. C., 348, 132 S. E., 673; *Evans et al. v. Beattie, Comptroller General, et al.,* 137 S. C., 496, 135 S. E., 538; *Craig v. Pickens County,* 189 S. C., 164, 200 S. E., 825.

It will be observed that the Act in question relates only to the fiscal operation of the schools of Williamsburg County. Apart from State aid, the burden of supporting the schools is assumed by the County and the various school districts are relieved from contributing to the cost of the operation of the schools. Whether this should be done in a particular county is peculiarly a local problem dependent upon local conditions. The special legislation relating to numerous counties shows there is a great disparity in the extent of the aid furnished by the counties in the operation of the schools, which probably is largely due to the wide dissimilarity in the financial resources of the various school districts of the State. Quite a number of the counties have in force a plan for the operation of the schools somewhat similar to the one under consideration, while there are others which have adopted it with varying degrees of modification. It is exceedingly doubtful whether a general law, uniform in operation throughout the State, regulating the measure of aid to be given by the counties to the districts or the extent of the control which should be vested in the county boards of education, could be made applicable.

■ The Act in question provides: "All duties of the existing County Board of Education shall devolve upon the Board of Education herein created when the same is not in conflict with the general law or the provisions of this Act". The general school law is, therefore, in force in Williamsburg County except to the extent that it is modified under the terms of the Act in question. We think the validity of this legislation may be fairly sustained as a special provision in the general law, permitted by the quoted portion of Section

34, Article 3, of the Constitution. *Walker et al. v. Bennett et al.*, 125 S. C., 389, 118 S. E., 779; *Arnette et al. v. Ford et al.*, 129 S. C., 526, 125 S. E., 138; *State et al. v. Meares, Supt. of Education, et al.*, 148 S. C., 118, 145 S. E., 695; *Powell et al. v. Hargrove et al.*, 136 S. C., 345, 134 S. E., 380; *Walpole v. Wall, County Supt. of Education*, 153 S. C., 106, 150 S. E., 760.

In *Walker v. Bennett, supra,* the Court had under consideration a special act consolidating five school districts of Greenville County into one and defining the powers and duties of the board of trustees. There was a general law authorizing county boards of education to consolidate school districts upon certain conditions. The Court held that said act did not contravene the section of the Constitution under consideration, stating that it was valid as a special provision in a general law and could be regarded as an amendment to the general law.

In *State v. Meares, supra,* the Court upheld as special provisions in the general laws certain acts which provided for the election of school trustees in certain counties, although the general law provided for their appointment by the county boards of education.

In *Walpole v. Wall, supra,* it was contended that an act creating a high school district in Berkeley County was unconstitutional as violating Section 34, Article 3, of the Constitution. The act was sustained as a special provision in the general high school law of the State. The Court said: "It will be observed that after adopting a general high school law the Legislature has seen fit to enact the act in question creating a high school district with somewhat different methods of administration, but having the same purpose as the general law; hence it cannot be successfully contended that the Act of 1929 is an exception to or in conflict with the general purposes of the state-wide high school law. * * * The * * * objection, that certain provisions relative to trustees contained in the State-wide high school law con-

flict with certain provisions of the Act in question, is not meritorious in view of the fact that the Act of 1929, creating this high school district, is to be deemed a special provision in a general law and amendatory of the general law".

■ It is true that the question of public education is not a matter of purely local concern, but is one to be regulated by a general law. But apart from the fiscal aspects, this Act does not invade the general field of education. There is no attempt to regulate the textbooks to be used or the subjects to be taught in the schools of Williamsburg County, the qualifications of teachers or the manner in which they shall be elected, school attendance or enrollment of pupils, the length of the school term, or various other matters pertaining to the general field of education. The general law regulating all these subjects is left undisturbed.

■ We also think that the authority to levy taxes given by the terms of this Act is a valid exercise of the power contained in the following portion of Section 5, Article 10: "The corporate authorities of counties * * * may be vested with power to assess and collect taxes for corporate purposes * * *". The only limitation upon this power is that contained in Section 6 of the same article which denies to the General Assembly the power to authorize any county or township to levy a tax or issue bonds except for educational purposes and certain other specified purposes not material to this discussion.

■ Under the foregoing section of the Constitution, the General Assembly is clearly given the power to authorize a county to levy taxes for educational purposes. Each County in this State is a separate taxing district and a statute providing for the levy of taxes on the property within a county for corporate purposes, while special in the sense that it imposes a tax limited in application to the property within such county, does not contravene Section 34, Article 3 of the Constitution, prohibiting the enactment of a special law where a general law can be made applicable. *State v. Touchberry,* 121

S. C., 5, 113 S. E., 345; *Anderson et al. v. Page et al., . . . .,* S. C., . . . ., 37 S. E. (2d), 289. In *Shelor v. Pace, Supervisor, et al.,* 151 S. C., 99, 148 S. E., 726, the Court upheld the validity of bonds issued by Oconee County for the purpose of discharging past indebtedness incurred by the County in paying the salaries of all the teachers of that County for the additional period required by the 6-0-1 School Law. It was held that a county-wide tax may be levied for educational purposes of a county.

The Referee was of the opinion that the Act could also be sustained, as against the contention that it was obnoxious to Article 3, Section 34, of the Constitution, under the authority of that portion of Article 7, Section 11, of the Constitution which provides that the General Assembly "may make special provision for municipal government". However, in view of the foregoing conclusions, we need not pass upon this question.

We shall next discuss the questions raised under Article 11 of the Constitution. This article relates to education. Respondents assert that the Act is violative of Sections 5 and 6. We think a brief reference to the contents of certain other sections in this article will aid in the determination of the questions raised by respondents. Section 1 creates the office of State Superintendent of Education. The supervision of public instruction is vested in this officer and it is provided that "his powers, duties and compensation shall be defined by the General Assembly". Section 2 creates a State Board of Education and provides that "this Board shall have the regulation of examination of teachers applying for certificates of qualification, and shall award all scholarships, and have such other powers and duties as may be determined by law". Section 3 is as follows: "The General Assembly shall make provision for the election or appointment of all other necessary school officers, and shall define their qualifications, powers, duties, compensation and terms of office". Section 5 provides: "The General Assembly shall provide for a liberal system of free public schools for all children between the

ages of six and twenty-one years, and for the division of the counties into suitable school districts, as compact in form as practicable * * *". Section 6 provides: "The General Assembly shall define 'enrollment'. Not less than three trustees for each school district shall be selected from the qualified voters and taxpayers therein, in such manner and for such terms as the General Assembly may determine * * *". This section further provides for an annual poll tax of one dollar, "the proceeds of which tax shall be expended for school purposes in the several school districts in which it is collected. Any school district may by the authority of the General Assembly levy an additional tax for the support of its schools". Section 12 provides that the net income derived by the State from the sale or licenses for sale of intoxicating liquors and beverages, not including that portion allowed to the counties or municipalities, shall be applied in aid of the supplementary taxes provided for in Section 6 just referred to. The remaining sections of Article 11 have no bearing on this discussion.

Section 6 of the Constitution formerly provided for two other sources of revenue for schools: (1) An annual three-mill tax in each county and the apportionment of same among the school districts in proportion to enrollment, to be expended and disbursed by the trustees, (2) A State supplemental tax to be distributed among the counties in proportion to the deficiencies therein existing in the school funds, to be disbursed as other school funds. These two sources of revenue were eliminated from Section 6 by the 1939 constitutional amendment (41 St., at L., 8).

Respondents contend that the Act contravenes Section 5 of Article 11, which requires the General Assembly to provide for the division of the counties into suitable school districts, in that it attempts "to create and set up for the entire County one authority", and contravenes Section 6 of Article 11, "in that it interferes with and diminishes the school taxes of, and the method of apportionment of such taxes among, the school districts of the County, and takes away the rights of each of the original school districts of the County

to levy taxes for the support of its school and for corporate purposes". In other words, it is argued that the Act destroys the separate entity of each school district in Williamsburg County and has the effect of converting the entire County into one school district; that it denies each school district the power to levy additional taxes for its schools; and denies the trustees of the various school districts the right to conduct and operate their schools in the manner provided for by the Constitution.

Many of the constitutional objections now made by respondents to this legislation were also asserted, and unsuccessfully so, to the formation of high school districts in this State. *Powell et al. v. Hargrove et al., supra* (136 S. C., 345, 134 S. E., 380).

■ It will be observed that the Constitution, as now amended, places very few restrictions on the power of the General Assembly in the general field of public education. It is required to provide "for liberal system of free public schools", but the details are left to its discretion. While the Constitution directs that the counties shall be divided into suitable school districts, nothing is "said therein as to the number or character of schools to be established or maintained in these districts, these things being left to the legislative power". *Hildebrand et al. v. High School District No. 32 et al.,* 138 S. C., 445, 136 S. E., 757. There are to be not less than three trustees for each school district, but the Constitution does not undertake to determine their powers and duties; these may be fixed by the General Assembly. There is nothing in the Act in question which affects the corporate existence or entity of the several school districts of Williamsburg County. It is true that some of the powers and duties vested in the trustees under the general school law of the State are taken away and vested in the County Board of Education, but this feature of the Act does not run afoul of any constitutional inhibition if, as we have held, the Act does not violate Section 34, Article 3, of the Constitution.

■ The Constitution does not undertake to prescribe the character or extent of local self-government which shall prevail in the various school districts. In the absence of some constitutional provision supporting it, there is no inherent right of local self-government of the schools which is beyond legislative control. It is true that "a school district is a body politic and corporate under the laws of this State and constitutes one of our most important political subdivisions" (*Patrick v. Maybank et al.,* 198 S. C., 262, 17 S. E. (2d), 530), but the scope of the self-government to be had in such district is left to the General Assembly except as to the minimum number of trustees to be selected from the district and the expenditure of the poll tax collected within the district. The development of our school system in South Carolina has demonstrated the wisdom of the framers of the Constitution in leaving the General Assembly free to meet changing conditions. At one time the schools were supported largely, if not entirely, by local tax levies. This resulted in a great injustice to the children of the poor or weak school districts. The argument that taxes levied for schools should only be expended in the district where collected is now antiquated and entirely discredited. It has become imperative that aid be extended to the weaker school districts. The educational opportunities of a child should no longer depend on the wealth of the district in which he happens to reside. As the counties or State assume a greater burden in supporting the schools, it is but natural that they should demand and be given a greater degree of control.

■ There is now no constitutional provision directing that county school taxes shall be apportioned in proportion to enrollment among the districts. The Constitution still requires, however, that the proceeds of the poll tax "shall be expended for school purposes in the several school districts in which it is collected". Appellants concede that Section 2 of this Act places all school funds, including those collected from the poll tax, to the credit of the County Board Fund and that it would be unlawful for the County Board to ex-

pend the receipts from poll taxes in any district other than in the one from which they were collected, but contend that the Constitution would not be violated until the Board attempted to improperly expend the funds. But we think the Act clearly contemplates the commingling of all school funds collected from any source and the expenditure of these funds by the County Board without reference to the district in which they are collected. There is no requirement that a separate account be kept of the poll taxes collected in the various districts. In fact, the Act undertakes to direct that any surplus now to the credit of a school district, from whatever source derived, shall be used to pay deficits of other school districts. This portion of the Act clearly violates the above provision of the Constitution in so far as the poll tax is concerned.

There remains for consideration under this phase of the case the contention that the Act denies each school district the power to levy additional taxes for schools. The provision of Article 11, Section 6, relied upon to sustain this contention, is as follows: "Any school district may by the authority of the General Assembly levy an additional tax for the support of its schools". It is clear that the right of a school district to levy an additional tax for the support of its schools is not absolute, but, as stated by the Referee, "only permissive and subject to authorization by the General Assembly".

We turn now to the question of the validity of that portion of the Act which provides that all outstanding bonded indebtedness of the several school districts of the County shall be assumed by the County Board of Education and that there shall be levied annually a county-wide tax to pay the principal and interest on the obligations thus assumed. It appears that the total amount of district bonds outstanding is considerably in excess of the amount of the sinking funds applicable to the payment of the bonds and under the terms of the Act this excess is to be paid by a county-wide tax. Respondents reside in a district which has no bonded

indebtedness and taxpayers in that district will be required to pay taxes used in discharging the bonded indebtedness of other school districts. Can this be lawfully done?

██ ██ The proceeds of these bonds presumably have been used to erect and equip school buildings and for other school purposes within the district. It may be conceded that the State or a county can lawfully give building aid to a school district. In fact, such has been done (31 St. at L., page 1132), and the practice of doing so has never been legally questioned. We may further concede, without deciding, that the County could have originally erected the school buildings of these districts with county funds. But they were not so constructed. The people of the district voluntarily chose to construct them as district projects because they regarded them as a peculiar benefit to the district. They voted bonds under the authority of the general law which became obligations of the district to be paid by a tax levy on the property within the district. The status of these bonds was definitely fixed as district obligations. This was done without the consent or participation of the people from other parts of the County. The buildings were not located or constructed under a county-wide plan of education. Tehre is nothing to show that this bonded indebtedness is now being assumed on the theory of equalizing the opportunities for public education throughout the County. As heretofore stated, we construe this Act as leaving the corporate entity of the several school districts undisturbed. The County is not being consolidated into one school district. The property continues to be that of the school district and under the terms of Section 5345, Code of 1942, school trustees are empowered, with the consent of the County Board of Education, to sell any school property within their district and apply the proceeds of sale to the school fund of the district. We are in full accord with the following statement of the Referee in his well-reasoned report:

"The Act now being assailed in no way purports to change the title to any of the tangible property of any school dis-

trict, or to confer any interest therein upon any other school district, the title remaining just the same as before the passage of the Act and being wholly unaffected thereby. The effect of this is to permit a school district to acquire the absolute ownership of property and to require the citizens of other school districts to help pay for it without acquiring any legal interest whatever therein. This plainly seems a denial of due process of law and the equal protection of the laws to the plaintiffs, who are citizens and taxpayers of Salters School District No. 32, which has no bonded indebtedness, but whose citizens and taxpayers are thus required to help pay off the bonds of other districts, which have had the full and exclusive benefit of the proceeds of the obligations.

"It is no answer to this objection to the Act that when there is a consolidation of school districts the subsisting obligations of any or all of the districts consolidating become the obligations of the consolidated district, because in the event of consolidation not only do the obligations of the districts consolidated become the obligations of the consolidated district but all the property of the districts consolidated becomes the property of the consolidated district. It is, therefore, not a case, as it is in this case, of requiring the taxpayers of one school district to help pay the debts of another school district without receiving anything in return."

The Supreme Court of North Carolina has upheld a statute of that State authorizing the assumption by a county of the bonded indebtedness of school districts within the county. But under the general school law of that State it is the duty of the board of county commissioners of each county to provide for the construction and equipment of adequate school buildings in each district of the county. The Court held that when the county commissioners failed to perform that duty and the buildings were provided by the district through the issuance of bonds, the assumption of such district indebtedness by a county is the mere performance of a duty which was imposed upon the board of county commis-

sioners in the first instance. *Reeves et al. v. Board of Education of Buncombe County et al.,* 204 N. C., 74, 167 S. E., 454; *Marshburn et al. v. Brown, Sheriff, et al.,* 210 N. C., 331, 186 S. E., 265. These cases are distinguishable from the instant case in that no such duty is imposed by law upon the counties of this State.

Our attention is called by appellants to the development of our State Highway System wherein counties were reimbursed by the State for bonded indebtedness incurred in the construction of roads which were later taken over as State highways. But the situation there is not parallel to the one before us. The State there assumed full control and supervision of the highways and the counties ceased to have any interest therein. But even on the question of the assumption by the states or counties of district bonded indebtedness incurred in construction of local roads within a district, there has not been a unanimity of opinion among the Courts of other jurisdictions. A learned discussion of that subject will be found in *Amos, State Comptroller, et al. v. Matthews,* 126 Sou., 308, where the Court was divided. Also, see *Commissioners of Johnson County v. Lacy, State Treasurer,* 174 N. C., 141, 93 S. E., 482, 2 A. L. R., 726; 51 Am. Jur., page 427.

No case has been cited and we have found none in our research where the precise question before us was involved. While the problem is not free from difficulty, we think the Special Referee and the Circuit Judge, both of whom decided this phase of the case adversely to appellants, reached the proper conclusion.

We proceed to consider the validity of that portion of the Act (Section 2) which directs that an offset be made between all current operation deficits and balances of the several school districts and the difference placed to the credit of the County Board Fund, subject to the order of the County Board of Education. Under the terms of the Act, this fund is to be pooled and expended on a county-wide basis with-

out regard to its sources, so that the funds of a district having a credit, produced by taxation in that district only, may be diverted from the uses for which they were collected and appropriated to the benefit of some other district or districts having a deficit. Under the case of *Ward et al. v. Cobb et al.,* 204 S. C. 275, 28 S. E. (2d), 850, we think it is clear that the diversion sought to be made runs counter to Article 10, Section 3, of the Constitution, which is as follows: "No tax shall be levied except in pursuance of a law which shall distinctly state the object of the same; to which object the tax shall be applied." However, respondents have not invoked this section of the Constitution but, as stated by the Referee, "it would seem very obviously to be equally in conflict with Article 1, Section 5, which is invoked."

■ The effect of the provision under consideration is to appropriate the surplus to the credit of one school district (and it is conceded that the district in hich respondents reside has a surplus) to the payment of a deficit already incurred in another school district through the operation of its schools. For the reasons stated in disposing of the preceding question, we think this constitutes a denial of due process of law and the equal protection of the laws to the respondents, who are citizens and taxpayers of a district which has such surplus. The taxpayers of this district are thus required to pay an indebtedness for schools incurred exclusively within and for the benefit of another school district.

■ It is suggested, however, that respondents, as taxpayers, have no such interest in this phase of the controversy as would enable them to attack the constitutionality of this provision. But we think respondents, as taxpayers, do have an interest in preventing the unlawful diversion of money raised by taxation and to enjoin what is, in effect, an illegal expenditure of public money belonging to a district which has been raised by taxation on their property and the property of others within the district. 11 Am. Jur., page 761; 16 C. J. S., page 170.

Since it is not shown by the record that the district in which respondents reside has any sinking funds to its credit, the respondents are not adversely affected by that portion of Section 5 directing the county treasurer to place all existing sinking funds of the several school districts into a common fund, to be applied to the payment of interest and principal of the bonds of the several school districts. We are, therefore, not required to pass upon the validity of this provision.

. It is conceded that the provision of Section 5 of the Act which, in effect, confers upon the legislative delegation the authority to fix the amount that may be borrowed by the County Board of Education for the purpose of repairing, enlarging, constructing and equipping school buildings is, under the authority of *Bramlette v. Stringer et al.,* 186 S. C., 134, 196 S. E. 257, invalid in that it violates Article 1, Section 14, of the Constitution, which provides that the three branches of the State Government shall be forever separate and distinct.

 It is further conceded that that portion of Section 4 of the Act which provides that the salary of the Clerk of the County Board of Education shall be approved by the legislative delegation is, for the same reason, invalid, but it is contended that the remaining portion of this section, which authorizes the County Board of Education, upon the recommendation of the County Superintendent of Education, to employ a clerk and to pay said clerk from the County Board Fund, should be permitted to stand. But we do not think the two parts are severable. To sustain appellants' contention would permit the salary of the clerk to be determined by the County Board of Education which obviously the General Assembly was unwilling to do. We think all of Section 4 must be stricken as invalid.

 When the case was heard before the Referee it did not appear that the district in which respondents reside had a surplus. Consequently, the Referee properly held that respondents, as taxpayers of this district, were not adversely

affected by the provision of Section 2 requiring that an offset be made between all current operation deficits and balances of the several school districts. He stated, however, that this requirement of Section 2 would be invalid as to any school district adversely affected. At the hearing in the Circuit Court it was conceded that said district did have a surplus. With this exception brought about by a change in the status of the record, we approve the clear summary made by the able Referee of the parts of the Act which are unconstitutional and those that are valid, and we are of the further opinion that he was correct in holding that the valid portion "is a complete act in itself, capable of being executed independently of the unconstitutional parts without doing undue violence to the legislative intent".

The judgment of the lower Court is modified in accordance with the views herein expressed.

MR. CHIEF JUSTICE BAKER and MESSRS. ASSOCIATE JUSTICES FISHBURNE, STUKES and TAYLOR concur.